UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | | |
|---|---|---|
| ROBERT ANNABEL, II, #414234, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:09-cv-796 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| JAMES ARMSTRONG, et al., | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

This is a civil rights action brought *pro se* by a state prisoner under 42 U.S.C. § 1983. Plaintiff's claims arise out of the numerous major misconduct convictions earned as a result of his incorrigible behavior at the Ionia Maximum Correctional Facility (ICF) from March 16, 2008, through November 22, 2008. His Amended Complaint names twenty-four State of Michigan employees as defendants on a variety of claims:

(1). On March 16, 2008, Resident Unit Officer (RUO) Aaron Rutgers confiscated two ink pens during a cell search and threatened plaintiff in violation of his First Amendment rights;

(2). The March 23, 2008 major misconduct charge against him violated his First Amendment Rights because it was false and retaliatory, and RUO Rutgers and Corrections Officer Daniel Mygrants used excessive force in subduing him on that date in violation of his Eighth Amendment rights;

(3).    On June 6, 2008, Corrections Officer Christopher King violated his First Amendment right of access to courts by confiscating an affidavit and reading it before returning it to plaintiff;

(4).    On June 29, 2008, Corrections Officer Todd Mahalic wrote a false major misconduct charge against him in violation of his Fourteenth Amendment substantive due process rights, and used excessive force against him in violation of plaintiff's Eighth Amendment rights;

(5).    Warden Willie O. Smith, Deputy Warden Nannette Norwood, and Jacque Cannon violated his Eighth Amendment rights by authorizing the use of restraints from July 3, 2008, through July 6, 2008, by depriving plaintiff of mental health care, and by limiting him to one blanket and pajama bottoms, depriving him of "basic hygiene" and limiting his shower access from July 7, 2008, through July 29, 2008; and violated his First Amendment rights because the authorization of restraints was "retaliatory," and he lacked access to grievance forms and ink pens;

(6).    In July and August 2008 Corrections Officers Mahalic and Donald King violated his First Amendment rights "by the retaliatory discarding" of unspecified pieces of incoming mail;

(7).    Grievance Manager James Armstrong, Deputy Warden Norwood, Corrections Officer Donald King, and Librarians Glenn Vos and Debra Givens violated his First Amendment rights "by the retaliatory restricting and periodically denying altogether law library and legal writer access," on and after August 25, 2008, when King wrote a false misconduct report against plaintiff for using a law book to break off the

sprinkler in his cell, Norwood imposed a law book restriction, Armstrong upheld the restriction, and Vos and Givens failed to provide plaintiff with all the legal materials he desired;

(8). Corrections Officers Jeffrey Sisson, Travis Lahr, Kacey Datema, Jose Oviedo, Jack Gardner, and Sergeant Steven Barber violated his First and Eighth Amendment rights on September 4, 2008, when the first three officers used excessive force and the others failed to intervene on plaintiff's behalf;

(9). Warden Smith, Deputy Warden Norwood, Assistant Resident Unit Supervisor (ARUS) Jason Wayne, and Corrections Officer Dennis Grandy violated his First, Eighth, and Fourteenth Amendment rights by "retaliatory and abusive authorization" of top-of-bed (TOB) restraints from September 4, 2008, through September 9, 2008;

(10). Warden Smith, Deputy Warden Norwood, ARUS Wayne, Captain Jubentino Sanchez, Grievance Coordinator Nancy Klinesmith, and Corrections Officer Rafael Hernandez, violated plaintiff's First and Eighth Amendment rights on October 15, 2008, by arranging for Officer Sisson to work overtime, which allowed Sisson to threaten plaintiff and punch him in the nose; and

(11). Greivance Manager Armstrong, Warden Smith, Deputy Warden Norwood, ARUS Wayne, and Psychologist Eric Lanes violated plaintiff's Eighth Amendment rights by deliberate indifference to the assaults by Corrections Officers Sisson, Rutgers and Mygrants, and failure to adequately investigate the more than 70 grievances plaintiff filed, and encouraging ICF corrections officers to assault prisoners.

(Second Amended Complaint, docket # 104). Plaintiff sues defendants in their individual capacities and seeks an award of damages and declaratory relief. (*Id.* at 8-9).

The matter is before the court on defendants' motions for summary judgment (docket #s 40, 85, 94). For the reasons set forth herein, I recommend that plaintiff's claims for declaratory relief be dismissed as moot. I further recommend that defendants' motions be granted, and that judgment be entered in defendants' favor on all plaintiff's claims.

## Applicable Standards

### A.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.[1] FED. R. CIV. P. 56(a); *Griffin v. Hardrick*, 604 F.3d 949, 953 (6th Cir. 2010). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Moses v. Providence Hosp. Med. Centers, Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008).

---

[1] "The standard for granting summary judgment remains unchanged" under the amendments to Rule 56 that went into effect on December 1, 2010. *See* FED. R. CIV. P. 56 advisory committee note (2010 amendments).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. *See Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see LaQuinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 335 (6th Cir. 2010).

## Facts

The following facts are beyond genuine issue.[2]  Plaintiff is in the custody of the Michigan Department of Corrections serving a prison sentence of 10-to-30 years on a conviction for first-degree home invasion.[3]  He was an inmate at the Ionia Maximum Correctional Facility (ICF) at all time relevant to this lawsuit.

### March 2008

On March 16, 2008, defendant Rutgers removed two ink pens during a shakedown of plaintiff's cell for contraband items.  (Am. Compl. ¶ IV(1), docket # 104, ID # 649; Plf. Aff. ¶ 1, docket # 66-3, ID # 445).  Plaintiff's affidavit states that to his knowledge, ICF staff members "do not give out free ink pens in that unit."  (Plf. Aff. ¶ 1, docket # 66-3, ID # 445).

On March 19, 2008, plaintiff was involved in a fight with another ICF prisoner. Plaintiff's medical records reveal that he suffered a superficial abrasion on his nose.  He stated to the examining nurse, "Did I get him good?  I don't need anything."  Plaintiff was the apparent instigator of the fight.  He was charged with possession of a weapon (a razor blade) and fighting. (docket # 48 at 3-6).  Plaintiff's March 2008 mental health records reveal a diagnosis of bi-polar, antisocial, and  borderline personality disorders, and significant problems related to his interaction

---

[2]Plaintiff's second amended complaint (docket # 104) is verified under penalty of perjury. The portions of plaintiff's pleading satisfying the requirements of Rule 56(c)(4) of the Federal Rules of Civil Procedure are considered as his affidavit in opposition to defendants' motions for summary judgment.  *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008); *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000).  Legal conclusions, whether asserted by a party in an affidavit or verified complaint, do not suffice to create a genuine issue of material fact for trial.  *See Medison Am. Ins. Co. v. Preferred Med. Sys., Inc.*, 357 F. App'x 656, 662 (6th Cir. 2009); *Doe v. Magoffin County Fiscal Ct.*, 174 F. App'x 962, 966 (6th Cir. 2006).

[3]*See People v. Annabel*, No. 249238, 2004 WL 2199506 (Mich. Ct. App. Sept. 30, 2004).

with the legal system and crime. (*Id.* at 5, 9). In March 2008, plaintiff stopped taking the medication that doctors had prescribed for treatment of his mental illness. (docket # 48 at 8). Plaintiff initially claimed that the medication was not working. (*Id.*). The reason he later gave was: "because I can." (*Id.* at 19). He states, "I was physically and mentally abused as a child, and I would agree that I suffer from post Traumatic Stress Disorder and that I react aggressively when mistreated or abused as [an] adult."[4] (Plf. Aff. ¶ 23, ID # 448). Plaintiff has a long history of mood instability, and the MDOC Reception Center's June 3, 2003 psychological report notes that deception and manipulation appear to be "central features of his personality." (docket # 66-18, ID #s 499-501).

On March 23, 2008, plaintiff received a major misconduct citation for threatening behavior issued by RUO Mygrants. While plaintiff was being escorted from the shower, he turned towards Mygrants and RUO Rutgers and stated, "I'm going to f__ you mother f___ers up." (docket # 46, 03/23/08 Major Misconduct report, ID # 309; Mygrants Aff. ¶ 4, ID # 300; docket # 49, Rutgers Aff. ¶ 6, ID # 327). While this major misconduct charge was pending, plaintiff filed a grievance against "RUO Rugentag" stating that plaintiff was initially missing two pens after the March 16, 2008 shakedown, but he had been "able to fish one of the pens into my cell from the hallway." (docket # 46, ID # 311). The grievance went on to claim that plaintiff had a verbal confrontation with Rugentag on March 16th in which the guard purportedly told plaintiff that he

---

[4]Plaintiff argues that he "was not so mentally ill that he could not function or understand his actions and environment." (Plf. Brief at 2, docket # 66). He states that medication "helps with his mood swings, but he can coherently function without it." (*Id.* at 22). The excuse he now offers for "cho[osing] to discontinue his psychotropic medication" is a belief that not taking medication could somehow increase his chances for a transfer back to the Marquette Branch Prison (MBP). (*Id.* at 23). It is well established that statements appearing in a party's brief are not evidence. *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006).

could not write grievances without a pen, and plaintiff asked the guard to open his door and they would settle the matter "right then and there." (Am. Compl. ¶ IV(1), ID # 649). On March 28, 2008, a hearing officer conducted a hearing and found plaintiff guilty of the major misconduct of threatening behavior, and in doing so, he rejected plaintiff's claim that Rutgers had threatened him on March 16, 2008. (docket # 46, 03/28/08 Major Misconduct Hearing Report, ID # 308; 03/25/08 Hearing Investigation Report, ID # 312; Rutgers Aff. ¶ 3, ID # 327). Plaintiff's Amended Complaint states that on March 16, 2008, Rutgers threatened to assault him when he complained about his missing pens. (Am. Compl. ¶ IV(1)). He states that he requested and received a Bandaid after his March 23, 2008 confrontation with Rutgers and Mygrants. (Plf. Aff. ¶ 3, ID # 445). He now admits that he refused a direct order, but claims that he did not threaten Rutgers. (Plf. Aff. ¶ 2, ID # 445).

### June 2008

On June 6, 2008, RUO Christopher King purportedly confiscated and read an affidavit that plaintiff had just written. (Am. Compl. ¶ 3, ID # 649; Christopher King Aff. ¶ 3, docket # 41-5, ID # 180). Plaintiff's Amended Complaint states that the affidavit was against King, but he provides no other evidence regarding its content. (Am. Compl., ¶ 3, ID # 649). In a June 8, 2008 grievance (docket # 41-5, ID # 182), plaintiff states that King initially made sure that he was not using the typewriter ICF provides for prisoners' legal work to write letters to his mother or girlfriend. King purportedly took the affidavit, but later returned it. Plaintiff claimed Christopher King's mishandling of this affidavit as his excuse for "taking the food slot hostage."[5]  His Step II grievance appeal

---

[5]"Holding the food slot hostage" by putting an arm through the slot to prevent it from being secured is against prison rules and a common form of prisoner misbehavior. *See e.g.*, *Earby v. Ray*, 47 F. App'x 744, 745 (6th Cir. 2002).

asserted that if he had not taken the food slot hostage, the affidavit "would not have been returned at all." (docket # 41-5, ID # 184). The purported June 6, 2008 affidavit has never been filed in this, or any other, lawsuit.

On June 29, 2008, while Officers Mahalic and Davis were in the process of removing plaintiff's high security restraints, plaintiff turned, reached through the cell door food slot, and attempted to grab Mahalic. Mahalic wrote a major misconduct citation against plaintiff for threatening behavior. (06/29/08 Major Misconduct Report, docket # 46-2, ID # 320). On July 10, 2008, a hearing officer conducted a hearing and found plaintiff guilty of the major misconduct charge. (07/10/08 Major Misconduct Hearing Report, docket # 46-2, ID # 319; Mahalic Aff. ¶¶ 3, 4, ID # 317). Plaintiff now claims that the misconduct charge was false and that Mahalic jerked on the restraints which caused him to suffer a bruised right shoulder. (Am. Comp. ¶ 4, ID # 650; Plf. Aff. ¶ 4, ID # 445). There is no medical evidence supporting plaintiff's claim. His psychological records reveal that on June 30, 2008, he was verbally abusive to his case monitor when she attempted to conduct a routine evaluation. He shouted, "Get the f#$k away from my door" and "I don't want to talk to no f#*king psych." (docket # 48 at 65).

### July 2008

Between July 3, 2008, and July 9, 2008, plaintiff was charged with and convicted of 20 major misconduct violations. (docket # 49-2, Norwood Aff. ¶ 4, ID # 330; Smith Aff. ¶ 7, ID # 191). Plaintiff's incorrigible behavior resulted in the imposition of safety and security restrictions under Policy Directive 04.05.120. Plaintiff was already housed in administrative segregation unit of the State's highest security level prison. His behavior necessitated the use of physical restraints.

(Smith Aff. ¶ 13, ID # 192). His continued belligerent behavior necessitated the use of a progression of increasingly more restrictive restraints: "from Full Soft, to Full Hard, to Anti-Window-Smashing Full Hard, to Top of Bed (TOB) and ultimately hand restrictive TOB restraints." (Smith Aff. ¶ 14, ID # 192). Once a prisoner is placed in restraints, members of the health care staff monitor his physical condition. Physical restraints are removed as soon as the prisoner's behavior permits and approval has been obtained from staff at the level of shift commander or higher. (Smith Aff. ¶ 13, ID # 192).

On July 3, 2008, plaintiff covered his cell door window and refused to remove the obstruction. He held the food slot hostage. (docket # 41-9, Wayne Aff. ¶ 5, ID # 197; docket # 49-2, ID # 335). Plaintiff was placed in full soft restraints. He later refused to allow staff to remove the restraints. (Wayne Aff. ¶¶ 5, 6, ID # 197; Norwood Aff. ¶ 5, ID # 331; docket # 49-2, ID # 335).

On July 4, 2008, plaintiff obstructed the ability of prison staff to observe his actions by covering his cell door window with paper. (Norwood Aff. ¶ 6, ID # 331; docket # 49-2, ID # 337). All paper items were temporarily removed from his cell. (Norwood Aff. ¶ 6, ID # 331). Plaintiff was permitted access to paper and writing materials outside his cell. (Norwood Aff. ¶ 6, ID # 331). Plaintiff was placed on food loaf status because he refused to return his food tray and utensils following his meal. (Norwood Aff. ¶ 6, ID # 331). He again held the food slot hostage. (Wayne Aff. ¶ 7, ID # 197; docket # 49-2, ID # 337). His restraints were upgraded to full hard restraints. (Wayne Aff. ¶ 7, ID # 197; docket # 49-2, ID # 337). Medical staff monitored plaintiff's condition while he was in restraints (docket # 48 at 66-67). Plaintiff initially refused to allow the restraints to be removed, but did allow staff to remove them on July 5, 2008. (Wayne Aff. ¶ 8, ID # 198; docket # 49-2, ID #s 338-41).

On July 7, 2008, plaintiff was placed on towel restriction after he covered his cell window. A slot restriction was imposed after he refused to remove his arm from his food slot. (Norwood Aff. ¶ 8, ID # 331; docket # 49-2, ID # 342). Plaintiff was placed in Anti-Window-Smashing (AWS) restraints at 1546 hours. (Wayne Aff. ¶ 9, ID # 198). He was checked by Nurse Johnson at 1648 hours. When Johnson attempted to talk to plaintiff, he responded by stating, "Go f___ yourself." (docket # 48 at 68). He refused to allow staff to remove the AWS restraints. He received a major misconduct for disobeying a direct order. (Wayne Aff. ¶ 9, ID # 198).

On July 8, 2008, plaintiff was placed on mattress restriction after he used his mattress to cover the cell door window. (Norwood ff. ¶ 9, ID # 331). The restraints were removed at 0616 hours on July 9, 2008. (Norwood Aff. ¶¶ 9-11, ID #s 331-32; Wayne Aff. ¶ 10, ID # 198; docket # 48 at 69; docket # 49-2, ID #s 345-48).

On July 14, 2008, plaintiff continued the same pattern. He covered his cell window and held the food slot hostage. (Wayne Aff. ¶ 12, ID # 198). He was placed in AWS full hard restraints at 1440 hours. He refused to cooperate in the attempts to remove the restraints at 1616 and 2033 hours. Sergeant Kelley issued a major misconduct citation against plaintiff for disobeying a direct order. Prison staff removed the restraints at 0634 hours on July 15, 2008. (Wayne Aff. ¶ 12, ID # 198; docket # 49-2, ID #s 353-55).

Plaintiff states he was unable to access an ink pen or paper from July 4, 2008, through July 29, 2008. (Plf. Aff. ¶ 5, ID # 445-46). He was not deprived of basic hygiene items or necessary clothing. (Norwood Aff. ¶ 12, ID # 332).

On August 25, 2008, plaintiff used a law book to destroy the sprinkler head in his cell. The cell flooded. Several law library books were destroyed and had to be replaced at considerable expense. (Norwood Aff. ¶ 13, ID # 332; Vos Aff. ¶ 5, ID # 268). RUO Donald King issued a major misconduct citation against plaintiff for "Destruction or Misuse of Property with a Value of $10 or More." (Donald King Aff. ¶ 5, ID # 234). Plaintiff had tied the book into a pajama top, then used it to smash the sprinkler head. (docket # 49-2, ID # 357). The charge was supported by photographs of the smashed sprinkler head. The prehearing investigation report indicates that plaintiff refused to participate in the process and simply spat at the door. Plaintiff now contends that the major misconduct charge was "false" because he used a toothbrush to break the sprinkler. (Plf. Aff. ¶ 8, ID # 446; Am. Compl. ¶ 7, ID # 651). On September 8, 2008, a hearing officer conducted a hearing and found plaintiff guilty of the major misconduct charge. (docket # 41-20, ID #s 243-47). Plaintiff received a temporary pajama top restriction, which was issued and expired on August 25, 2005. (Wayne Aff. ¶ 16, ID # 199).

On August 25, 2008, Deputy Warden Norwood placed plaintiff on temporary law book restriction in accordance with Policy Directive 04.05.120. (Norwood Aff. ¶ 13, ID # 332; King Aff. ¶ 5, ID # 234; Am. Compl. ¶ 7, ID # 650). Plaintiff had damaged a number of law books when he broke off the sprinkler head in his cell. The law books were not salvageable and had to be replaced at a considerable expense. Until the books were replaced, they were not available for the other prisoners at ICF to use. (docket # 41-23, Vos Aff. ¶ 5, ID # 268). Plaintiff appealed Norwood's decision to James Armstrong. Armstrong upheld the restriction. (Am. Compl. ¶ 7, ID # 651). Plaintiff was supplied with photocopies of requested legal materials. (Norwood Aff. ¶ 14,

ID # 332). Plaintiff states that the law book restriction reduced his ability to do legal research. (Am. Compl., ¶ 7, ID # 651).

Plaintiff was placed in full soft restraints after he broke the sprinkler. He refused to cooperate when staff attempted to remove the restraints at 1959 hours. (Wayne Aff. ¶¶ 16, 17, ID # 199; docket # 49-2, ID # 358-60). On August 26, 2008, he jammed the food slot with his restraints and broke the soft restraints. Deputy Norwood authorized application of full hard restraints. (Wayne Aff. ¶ 19, ID # 200; docket # 49-2, ID # 360-63). Plaintiff then jammed the locks on the hard restraints so that they had to be cut off. Plaintiff received a major misconduct citation for Destruction/Misuse of State Property valued at over $10. At approximately 1245 hours Deputy Norwood authorized application of TOB restraints. (Wayne Aff. ¶¶ 19, 20, ID # 200; docket # 49-2, ID # 364). Plaintiff remained in the TOB restraints on August 27, 2008, because when prison staff attempted to remove them, he threatened to assault them, and spat on them when they offered him meals and breaks. (docket # 49-2, ID #s 365-67). Plaintiff received a major misconduct citation for threatening behavior. Plaintiff's condition was monitored while he was in restraints. The TOB restraints were removed on August 28, 2008 at 1950 hours. (docket # 48 at 78-82; Wayne Aff. ¶ 20, ID # 200; Smith Aff. ¶ 15, ID # 192, docket # 49-2, ID # 368).

Plaintiff states that sometime in July and August 2008 Officers Donald King and Todd Mahalic discarded "several pieces" of plaintiff's incoming mail. (Am. Compl. ¶ 6, ID #s 650-51). On August 4, 2008, plaintiff filed a grievance asserting that there was a problem with his incoming mail, and that an envelope from the Philadelphia Church of God, grievance responses, and a July indigent store list and approval were missing. There is no evidence that defendants King or

Mahalic were responsible for any of plaintiff's missing mail. (Donald King Aff. ¶ 3, ID # 234; Mahalic Aff. ¶ 5, ID # 317).

<u>September 2008</u>

On September 4, 2008, at 0700, plaintiff threatened Officer Cunningham when he attempted to retrieve a meal tray. Plaintiff received a major misconduct citation for threatening behavior. (Wayne Aff. ¶ 21, ID # 200). Plaintiff broke his food tray and refused to return the pieces to prison staff. (Wayne Aff. ¶ 22, ID # 200; Grandy Aff. ¶ 3, ID # 204). Plaintiff refused to comply with orders directing him to back up to the cell door to allow officers to place him in restraints. (docket # 49-2, ID # 370). While the unit sergeant was speaking to plaintiff, plaintiff assaulted Officer Eastman by throwing food on him. (Wayne Aff. ¶ 22, ID # 200; Smith Aff. ¶ 15, ID # 192; Grandy Aff. ¶ 3, ID # 204; Norwood Aff. ¶ 15, ID # 332; docket # 49-2, ID # 370). Plaintiff was placed on food loaf status from September 4, 2008 to September 10, 2008 (Wayne Aff. ¶ 22, ID # 200).

A response team removed plaintiff from his cell. Deputy Warden Norwood authorized application of TOB restraints. (Norwood Aff. ¶ 15, ID # 332). Plaintiff's cell was searched for pieces of the broken tray. He was escorted to the shower area where he was searched. As plaintiff was being escorted back to his cell, he fell to his knees and refused to walk. The response team carried plaintiff back to his cell and placed him in TOB restraints. (docket # 49-2, ID # 371). Plaintiff was evaluated by health care staff after the application of restraints, and no injuries or medical concerns were noted. (Norwood Aff. ¶ 15, ID # 332). During one of the attempts to provide plaintiff with a bathroom break, prison staff discovered that plaintiff had tampered with

the padlocks, rendering them inoperable. Plaintiff described jamming the locks as being "passively defiant." (Plf. Aff, ¶ 9, ID # 446). Plaintiff's ability to damage less restrictive restraints necessitated application of modified hand restrictive TOB restraints. (Wayne Aff. ¶ 24, ID # 201; Plf. Aff. ¶ 9, ID # 446; docket # 49-2, ID # 372). Plaintiff resisted the application of these restraints and spit, kicked and grabbed prison staff. (Norwood Aff. ¶ 16, ID # 332). Plaintiff sustained a small abrasion (.7 cm. x .7 cm.) on his left wrist, which prison healthcare treated with a Bandaid. (Norwood Aff. ¶ 16, ID # 332; docket # 48 at 83-93). Because plaintiff spat on members of prison staff, Deputy Warden Norwood authorized a spitter's mask restriction. (Smith Aff. ¶ 15, ID # 192, docket # 49-2, ID # 372). Plaintiff's restraints and medical status were checked on a regular basis.

On September 4, 2008, at 1237 hours, Psychologist Lanes noted that plaintiff remained extremely agitated and was making threats: "I'm going to kill one of you bitches the first opportunity I get." (docket # 48 at 85). On September 8, 2008, Lanes noted that when plaintiff was not enraged and trying to assault people, he behaved in an exceedingly apathetic manner. He would not attend to personal hygiene and other activities of daily living. "[O]ne has to kick on his cell door to obtain a response when not in his cell trying to talk to him." (docket # 48 at 91). Dr. Lanes found "a pretty clear indication of mood distress above and beyond extreme expressions of anger." (*Id.*). Plaintiff did not appear to be at risk of suicide because his aggression was directed towards others. (*Id.*). Deputy Norwood authorized removal of the hand restrictive restraints, and the restraints were removed at 1430 hours on September 9, 2008. (Wayne Aff. ¶ 25, ID # 201; docket # 49-2, ID # 373; Smith Aff. ¶ 17, ID # 192). September 10, 2008 mental health records describe plaintiff as having a "grandiose sense of self and extremely poor judgment. Projection is a primary defense for him as he is the one who is angry and hostile." (docket # 48 at 94). When plaintiff was questioned on

September 30, 2008, about his homicidal or suicidal ideations he replied, "Why would I want to hurt myself when you all do such a good job. I am only mad at a couple of Officers and I want to think about killing them, but the rest I just put out of my head." (docket # 48 at 104). Plaintiff continued to project all responsibility on others. "When [] asked about behaviors such as taking his food slot hostage and then being surprised when something happens[], he blamed staff." (docket # 48 at 104).

On September 17, 2008, plaintiff drafted a grievance asserting that Officer Sisson had opened his cell window shutter and said, "Die, Annabel, Die." The grievance went on to assert that Sisson had once attempted to put him on food loaf without proper cause, once threw his meal tray on the cell floor, and claimed that Sisson "sexually assaulted me in restraints once," without providing any specific details as to date, location, time, circumstances, etc. (docket # 41-21, ID # 251). There was no evidence supporting any of these assertions, but given the seriousness of the sexual assault allegation, a copy of the grievance was forwarded to Inspector Goodson for investigation. (*Id.* at ID # 252-54). Plaintiff's medical complaints during this time period concerned his weight loss, swollen feet, and hand and wrist discomfort (docket # 48 at 95-106). Progress notes dated October 1, 2008, state as follows:

> Questioned patient regarding grievance that he sent to RUM, stating that he had been sexually assaulted while in restraints. Patient laughed and stated he was grabbed in the genitals by another person. He states this took place on 9-4-08. He denies any injury, discoloration, or swelling to area.

(docket # 48 at 105). The explanation plaintiff offers for not allowing medical staff to examine him is: "I did not feel comfortable with such an intrusive procedure." (Plf. Aff. ¶ 14, ID # 477). He denies laughing when he was questioned by medical staff about the alleged assault. (*Id.*).

Plaintiff's Amended Complaint provides scant details regarding the alleged September 4, 2008 assault. It states that plaintiff was in TOB restraints on September 4, 2008, and that Sisson, while holding a riot shield against plaintiff's head, somehow "painfully clenched" plaintiff's testicles through his clothing and "repeatedly punched the shield he was holding against plaintiff's head." (Am. Compl. ¶ 8). He states that defendant Lahr twisted his fingers and that defendant Datema reached under the shield and flicked his nose. (Am. Compl. ¶ 8). There is no record of the purported incident plaintiff now claims as excessive force. (Oviedo Aff. ¶¶ 3-7, ID # 216-17; Barber Aff. ¶¶ 3-7, ID #s 219-20; Lahr Aff. ¶¶ 4-6, ID #s 210-11; Datema Aff. ¶¶ 3-5, ID #s 222-23; Gardner Aff. ¶¶ 3-8, ID # 225-26). Medical records do not support plaintiff's claims of injury to his face, fingers, or testicles. (docket # 48 at 83-86, 105). His only injury on September 4, 2008, was the small abrasion on his wrist previously noted. (docket # 48 at 83-87).

### October 2008

On October 3, 2008, Dr. Lanes noted that plaintiff's appearance and hygiene had improved and he was doing a much better job of keeping his cell clean and in good order. Lane's assessment was, "This prisoner has significant characterological problems. He can be obstinate beyond comparison. Yet there is evidence of depression on the downside of last month's manic episode." (docket # 48 at 107). Plaintiff "appear[ed] to be functioning adequately in his present [segregation] situation over the past week only because his manic rage is now exhausted." (*Id.*). Dr. Lanes opined that "the level of rage and dyscontrol he maintained for several weeks awhile back was above and beyond that maintained for someone in purely Axis II context." (*Id.*).

On October 15, 2008, plaintiff threw his food tray out the food slot and into the gallery. He stated that he was going to "stab Sisson." He was charged with the major misconduct of threatening behavior and disobeying a direct order:

> Approximately 1555 hours while this officer [J. Sowa] was passing food trays, Prisoner Annabel # 414234 (40-1) threw his food tray out the food slot, stating "I'm going [to] stab Sisson!" I believe if given the opportunity, prisoner Annabel would attempt to carry out his threat. Annabel then would not allow staff to close his food slot. This officer gave prisoner a direct order to remove his arm from the food slot. At no time did Annabel comply with this officer's direct order. Prisoner Annabel identified by his MDOC ID and the Unit Master Count.

(10-15-08 Major Misconduct Report, ID # 260). Plaintiff's statement to the investigator was, " I don't challenge." (docket # 41-21, ID # 261). At approximately 1610 hours on October 15, 2008, plaintiff resisted the response team's attempt to gain control over him. His medical records indicate that he sustained a bloody nose. Officer Sisson was not a member of the response team. (docket # 48 at 110-113, 120, docket # 49-3, ID #s 374-76). Plaintiff was escorted to the unit shower where he spat on Officer King. Plaintiff was charged with the major misconduct of assault and battery against a prison guard:

> At approx 1614 hrs after placing prisoner Annabel # 414234 in the A-wing shower prisoner Annabel spat at his officer striking me in the right shoulder.

(10/15/08 Major Misconduct Report, docket # 41-21, ID # 257). Plaintiff's statement to the investigator on this charge was, "You aren't going to allow a defense of duress, so I'm wasting my time." (docket # 41-21 at ID # 258). Plaintiff belatedly offers the affidavits of several prisoners in support of an assertion that Sisson provoked his violent response[6] by throwing his meal tray on the

---

[6]*See* Plf. Brief at 15.

floor and by calling him names. (Johnson Aff. ¶ 2, ID # 451; Sandifer Aff. ¶¶ 2, 3, ID # 458, Hoss Aff. ¶ 1, ID # 462; Holmes Aff. ¶¶ 3-8, ID #s 474-75).

On October 17, 2008, plaintiff showered Psychologist Lanes with obscenities. (*Id.* at 114). Progress notes reveal that he made repeated attempts to spit on one of his care providers "5 or 6 times [plaintiff] would attempt to catch [him] off guard so that he would not be able to get the slot door closed." (*Id.* at 117). The psychologist noted that plaintiff appeared to be "cycling up again after a post-manic down period (part of August was rage, part of September was the 'down')." Plaintiff's comments and actions had a "rather paranoid flavor." (docket # 48 at 114).

On October 21, 2008, a hearing officer conducted a hearing on the charges filed against plaintiff on October 15, 2008. Plaintiff refused to participate in the hearing, telling the guard who tried to escort him to the hearing: "Go f__k yourself." The hearing officer found plaintiff guilty of the major misconduct charge. (10/21/08 Major Misconduct Hearing Report, docket # 41-21, ID # 256). Plaintiff states that he refused the October 23, 2008 opportunity to have his nose x-rayed because he did not have the double black eyes characteristic of a broken nose. (Plf. Aff. ¶ 18, ID # 448).

It is not clear how long plaintiff waited before he first asserted that Sisson had threatened him with a "second" sexual assault and punched him on October 15, 2008 (Am. Compl. ¶ 10, ID # 653), but it is apparent that the allegation surfaced sometime after plaintiff had been convicted of the above-referenced major misconduct charges. Plaintiff now offers these purported actions by Sission as justification for his October 15, 2008 misconduct. (Am. Compl. ¶ 10, ID # 653). There is no evidence that any defendant arranged for Sisson to work overtime on October 15, 2008, to allow him to threaten or punch plaintiff, and no evidence that any prison official condoned

or encouraged guards to threaten or assault prisoners. (Klinesmith Aff. ¶ 4, ID # 249; Sanchez Aff. ¶¶ 3, 4, ID # 264; Wayne Aff. ¶ 26, ID # 201, Armstrong Aff. ¶¶ 15-17, ID # 593, Smith Aff. ¶ 20, ID # 193; Norwood Aff. ¶¶ 18, 19, ID # 333; Hernandez Aff. ¶¶ 3-4. ID # 231; Lanes Aff. ¶ 3, ID # 213).

<u>November 2008</u>

On November 20, 2008, Librarian Vos received an e-mail inquiry from the librarian at the Handlon Correctional Facility inquiring what other librarians do when prisoners demand that legal writer prisoners act as their personal typing service. Librarian Vos provided this response:

> What a coincidence that you should ask today. I have a real problem child who receives Legal Writer assistance who sent a very detailed kite to his Legal Writer today. The kite was full of "instructions" to the Legal Writer about the typing the client expects the Legal Writer to do for him right down to replace a word, spacing, etc. The Legal Writers do not have to do typing for their clients. In the past, some of the contractor's lawyers have tried to pacify clients by instructing the Legal Writers to do their typing. I will not stand for it. Together my two level V Legal Writers have 101 clients. My Legal Writers do not have time to provide a typing service.

(docket # 66-15, ID #491). The e-mail thread ends with a librarian from another prison stating, "PD 05.03.118 [¶] S states that legal writers are not a typing service and will not make changes to pleadings just because the prisoner wants a specific format. You were right to refuse to placate these ridiculous demands." (docket # 66-15, ID #491).

On November 22, 2008, Legal Writer Wappler wrote a memorandum to plaintiff reminding him that Wappler was not his personal typing service:

> Please be advised that the Legal Writer's Program is not a typing service for prisoners. Your pleadings and documents show you can adequately and neatly print your pleadings. There are only 5 Legal Writers available and we have numerous prisoners to serve and do not have the time to laboriously type pleadings you can prepare.

> Both the State and Federal Courts wherein you are filing pleadings including your Petition for a Writ of Habeas Corpus and Petition for a Writ of Certiorari accept hand printed pleadings.
>
> I am returning your instruction sheet dated 11/18/08 and Petition for Writ of Habeas Corpus that you have requested to be typed.
>
> Thank you for your cooperation.

(docket # 66-14, ID # 489; *see* Plf. Aff. ¶ 22, ID # 448). On November 22, 2008, Librarian Vos sent plaintiff a memorandum noting that there was nothing in his medical record supporting his assertion that injuries prevented him from hand-copying documents. (docket # 66-14, ID # 488).

On May 1, 2009, plaintiff was transferred to the Macomb Correctional Facility. (Plf. Aff. ¶ 25, ID # 448). He filed this lawsuit on August 28, 2009.

## Discussion

### 1. Mootness

Plaintiff is an inmate at the Michigan Reformatory. Defendants are employed by the State at ICF. Plaintiff's claims for declaratory relief against defendants are moot. *See Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996).

### 2. Major Misconduct Convictions

Plaintiff claims that the major misconduct charges against him were "false." A prisoner's ability to challenge a prison misconduct conviction depends on whether the convictions implicated any liberty interest. In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before depriving a prisoner of good-time credits on account of alleged misbehavior. The *Wolff* Court

did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

Plaintiff does not allege that his major misconduct convictions resulted in any loss of good-time credits, nor could he. The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[7] for prisoners convicted for crimes occurring after April 1, 1987. In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence. Rather, it merely affects parole eligibility, which remains discretionary with the parole board. 481 F.3d at 440. Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th Cir. 2009), the court held that a misconduct citation in the Michigan prison system does not affect a prisoner's constitutionally protected liberty interests, because it does not necessarily affect the length of confinement. 335 F. App'x at 912; *accord, Wilson v. Rapelje*, No. 09-13030, 2010 WL 5491196,

---

[7] For crimes committed after April 1, 1987, Michigan prisoners earn "disciplinary credits" under a statute that abolished the former good-time system. MICH. COMP. LAWS § 800.33(5).

at * 4 (E.D. Mich. 2010) (Report & Recommendation) ("plaintiff's disciplinary hearing and major misconduct sanction does not implicate the Fourteenth Amendment Due Process Clause"), adopted as judgment of court, Order of Jan. 4, 2011. In the absence of a demonstrated liberty interest, plaintiff has no due-process claim. *See Bell v. Anderson*, 301 F. App'x 459, 461-62 (6th Cir. 2008).

Even in the absence of a protectible liberty interest in disciplinary credits, a prisoner may be able to raise a due-process challenge to prison misconduct convictions that result in a significant, atypical deprivation. *See Sandin v. Connor*, 515 U.S. 472 (1995). Plaintiff has not identified any significant deprivation arising from his convictions. Although some of the restraints to which plaintiff was subjected (such as TOB restraint) may qualify as atypical if imposed for punitive reasons on a misconduct conviction, there is no evidence that such restraints were so used in this case. Rather, these restraints were applied by order of the Assistant Warden in an effort to control plaintiff's violent outbursts, not as sanctions ordered by the hearing officer. Unless a prison misconduct conviction results in an extension of the duration of a prisoner's sentence or some other atypical hardship, a due-process claim fails. *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004).

### 3. Eighth Amendment Claims

#### A. Excessive Force

Plaintiff alleges that on March 23, 2008, defendant Rutgers and Mygrants used excessive force against him by jerking his restraints; that on June 29, 2008, defendant Mahalic used excessive force by jerking on his restraints; that on September 4, 2008, defendants Sisson, Datema, and Lahr used excessive force, Gardner, Oviedo, Woods and Barber failed to intervene, and Smith, Norwood, Wayne and Grandy authorized the use of TOB restraints; that Smith, Norwood, Wayne,

Sanchez, Klinesmith and Hernandez arranged to Sisson to work overtime on October 15, 2008, which allowed Sisson to threaten and punch plaintiff in the nose.

As a prisoner incarcerated under a criminal conviction, plaintiff's principal substantive rights are guaranteed by the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Ingraham v. Wright*, 430 U.S. 651, 664 (1977). The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of crimes. To establish a violation of the Eighth Amendment's Cruel and Unusual Punishments Clause, the offending conduct must reflect an unnecessary and wanton infliction of pain. *See Ingraham*, 430 U.S. at 670. "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause the core judicial inquiry is that set out in *Whitley [v. Albers*, 475 U.S. 312, 320-21 (1986)]: whether the force was applied as a good faith effort to maintain or restore discipline, or maliciously or sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *see Wilkinson v. Gaddy*, 130 S. Ct. 1175, 1178 (2010). Plaintiff must satisfy both an objective and subjective test to establish a viable Eighth Amendment claim. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991).

To meet the objective component, the prisoner must be subjected to a serious deprivation. *Wilson*, 501 U.S. at 298. The federal courts recognize that an Eighth Amendment claim based on the excessive use of force must allege more than a simple assault and battery. *See, e.g., Leary v. Livingston County*, 528 F.3d 438, 445 (6th Cir. 2008); *Pruitt v. Hatchett*, 292 F. App'x 408, 409 (5th Cir. 2008). To be sure, under *Hudson v. McMillian*, guards may not inflict an unjustified beating upon a prisoner and then seek to defend their actions by the lack of serious or life-threatening injuries. *See Wilkins v. Gaddy*, 130 S. Ct. at 1178-79; *McHenry v. Chadwick*, 896 F.2d 184, 187 (6th

Cir. 1990). By the same token, if the objective component of the Eighth Amendment is to mean anything, it cannot be satisfied by a mere unwanted touching. "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins v. Gaddy*, 130 S. Ct. at 1178; *Walters v. Corrections Corp. of Am*., 119 F. App'x 190, 192-93 (10th Cir. 2004); *Hampton v. Alexander*, No. 95-3457, 1996 WL 40237, at * 1 (6th Cir. Jan. 31, 1996); *Norman v. Taylor*, 25 F.3d 1259, 1262-63 (4th Cir. 1994) (*en banc*).

For the most part, plaintiff's allegations do not meet the objective component of an Eighth Amendment claim. Most of plaintiff's allegations of harm are relatively trivial and represent the foreseeable consequences of forcibly resisting or assaulting officers. Hence, complaints about pain from jerking handcuffs and the like, in the context of the present case, do not meet the objective component of an Eighth Amendment claim. I assume for purposes of analysis, that some of plaintiff's allegations are sufficiently serious to meet the objective component.

No reasonable jury, however, could fail to hold for defendants on the subjective component of an Eighth Amendment claim. The record discloses that plaintiff is a violent and dangerous prisoner with serious mental problems. His explosive nature and possession of dangerous weapons, such as razor blades, pose clear dangers to officers and inmates alike. The record discloses that virtually all of plaintiff's allegations of excessive force came in the context of a response by prison officials to plaintiff's aggression. The governing authority is *Whitley v. Albers*, 475 U.S. 312 (1986). *Whitley* addressed a section 1983 claim brought by a convicted prisoner who claimed that prison officials had violated his Eighth Amendment rights by shooting him in the knee during the prison riot. The court began its Eighth Amendment analysis by reiterating the long-established maxim that an Eighth Amendment violation requires proof of the "unnecessary and wanton infliction

of pain." 475 U.S. at 319. The Court went on to say that when prison officials use physical force against an inmate "to restore order in the face of a prison disturbance, . . . the question whether the measure taken inflicted unnecessary and wanton pain . . . ultimately turns on whether 'the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.* at 320-21; *accord Hudson v. McMillian*, 503 U.S. at 6. This test applies when a prisoner complains about the use of restraints, tear gas, or other forceful measures by prison officials. *See Williams v. Curtin*, 631 F.3d 380 (6th Cir. 2011). In applying this standard, the court should not focus on the seriousness of the injuries, but on the nature and reasons for the use of force. *Id.* at 384.

   No reasonable jury viewing the present record could conclude that plaintiff was subjected to excessive force, in violation of his Eighth Amendment rights, in any of the incidents alleged. The Supreme Court has recognized that when a prison security measure is undertaken to resolve a disturbance posing significant risk to the safety of prison staff or other inmates, the Eighth Amendment is violated only when the measures taken inflicted "unnecessary and wanton pain and suffering." *Whitley*, 475 U.S. at 320-21. Reasonable measures taken to gain control of a prisoner, including shoving, grabbing, and bending of fingers, do not violate Eighth Amendment standards when reasonably necessary to bring the prisoner under control and to return him to the cell. *See Lockett v. Suardini*, 526 F.3d 866, 876 (6th Cir. 2008). The record demonstrates that petitioner was engaged in a campaign of defiant, violent behavior. Prison officials reacted in a measured way, escalating the level of restraints only in response to plaintiff's defiance, destruction of soft restraints,

or continued assaults on staff.[8]  Plaintiff's violent acts, and threats to kill prison staff, called for forceful measures.

"In determining whether the use of force was wanton or unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley v. Albers*, 475 U.S. at 321).  It is difficult to imagine a prisoner who posed a greater threat to the safety of prison guards and other prisoners than plaintiff did during the period in 2008 at issue.  He was a convicted felon with serious mental health problems who refused to take his medication and was housed  in the administrative segregation unit of Michigan's highest security level prison.  Despite the higher level of security, he was successful in assaulting staff and destroying prison property.  Use of response teams, restraints, "spitter's masks" and other prisoner-control techniques can violate constitutional rights, but only when they are used maliciously, in order to inflict pain, and not in a good-faith response to a prisoner's aggression.   No reasonable jury could conclude that any defendant violated plaintiff's Eighth Amendment rights on the record.  Far more forceful responses would have been justified without violating the Eighth Amendment's Cruel and Unusual Punishments Clause.  Medical records show no serious injury, attesting to the measured nature of defendants' response.  I find that no reasonable trier of fact could find on the present record that

---

[8] The only allegation that is not subject to this analysis is plaintiff's incredible assertion of a "sexual assault" by Sisson.  Assuming that a trier of fact would believe plaintiff's uncorroborated assertions, the alleged conduct does not rise to the level of an Eighth Amendment violation.  *See Jackson v. Madery*, 158 F. App'x 656, 661 (6th Cir. 2005); *Boddie v. Schneider*, 105 F.3d 857, 859-60 (2d Cir. 1997).

defendants acted maliciously and sadistically for the purpose of causing plaintiff serious harm. *See Hudson*, 503 U.S. at 7.

B.     Deliberate Indifference to his Serious Medical Needs

Plaintiff alleges that Warden Smith, Deputy Warden Norwood, and Jacques Cannon violated his Eighth Amendment rights by depriving him of mental health care. The medical record establishes that plaintiff's allegations are demonstrably untrue. (*See* docket # 48, at 1-131). No reasonable trier of fact could find in plaintiff's favor on the objective or subjective components of his claims of deliberate indifference to serious medical needs. *See Wilson v. Seiter*, 501 U.S. 294 (1991); *Estelle v. Gamble*, 429 U.S. 97 (1976); *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005).

C.     Deliberate Indifference to the Risk of Assaults Against Plaintiff

Plaintiff alleges that defendants Armstrong, Smith, Norwood, Wayne, and Psychiatrist Eric Lanes were deliberately indifferent to the risk of guards assaulting ICF prisoners and refused to investigate or hold offending staff accountable "even though many prisoners filed numerous complaints (in 2008 alone, over 3000 grievances were filed, more than 70 by Plaintiff)." (docket # 104 ¶ IV(11), ID # 654). Plaintiff's claims cannot withstand defendants' motion for summary judgment for several reasons. First, plaintiff cannot litigate the claims of other prisoners. The law is well established that as *pro se* litigants, they may not act in a representative capacity and are limited to representing themselves on their own claims. *See* 28 U.S.C. § 1654; *accord Winkleman v. Parma City Sch. Dist.*, 550 U.S. 516, 521-22 (2007). The Sixth Circuit has repeatedly held that *pro se* prisoner litigants are inadequate class representatives. *See*, *e.g.*, *Ziegler v. Michigan*, 59 F. App'x

622, 624 (6th Cir. 2003); *Palasty v. Hawk*, 15 F. App'x 197, 200 (6th Cir. 2001); *Marr v. Michigan*, No. 95-1794, 1996 WL 205582, at *1 (6th Cir. Apr. 25, 1996) ("[A]n imprisoned litigant who is not represented by counsel may not represent a class of inmates because the prisoner cannot adequately represent the interests of the class.") (citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)). Second, liability of supervisory officers under 42 U.S.C. § 1983 cannot be based upon a *respondeat superior* theory. *See Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006). Third, blunderbuss attacks of this nature do not suffice at the summary judgment stage. There must be specific evidence with regard to the allegedly wrongful conduct of each defendant. Fourth, claims that grievance investigations were not adequate are not claims of constitutional dimension. Liability under section 1983 may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Fifth, even assuming that plaintiff's claims did rise to constitutional levels, there is no evidence supporting plaintiff's argument that the investigations of his grievances were inadequate. Defendants are entitled to judgment in their favor as a mater of law on these claims.

### D.  Conditions of Confinement

The Eighth Amendment requires that prisoners be provided with the "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. at 337, 347 (1981). The function of a federal court in a conditions of confinement case is not how best to operate a prison facility, nor to decide what is most desirable to the inmates. *Walker v. Mintzes*, 771 F.2d 920, 927 (6th Cir. 1985). "The Constitution does not mandate comfortable prisons." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Moreover, "[n]ot every unpleasant experience a prisoner might endure while

incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. Plaintiff's claims that he was limited to one blanket and pajama bottoms for a period in mid-summer does not violate constitutional standards. There is no evidence that plaintiff was deprived of adequate hygiene items or showers when he behavior would allow them. He admits that he used his toothbrush to destroy the sprinkler in his cell. No reasonable trier of fact could find an Eighth Amendment violation on this record.

### 4.      Substantive Due Process

        Plaintiff alleges that defendants Smith, Norwood, Wayne, and Grandy violated his rights under the substantive component of the Fourteenth Amendment's Due Process Clause by authorizing the use of TOB restraints. (docket # 104, ¶ IV(9), ID # 652)[9]. "The Supreme Court has cautioned courts to carefully scrutinize so-called substantive due process claims brought under § 1983 'because guideposts for responsible decisionmaking are scarce and open-ended.'" *Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 452 (6th Cir. 2002) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)). "[W]here a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see Banks v. City of Whitehall*, 344 F.3d 550, 554 (6th Cir. 2003). Here, the Eighth Amendment provides plaintiff's explicit constitutional protection against Cruel and

_____

[9]Plaintiff alleges that the major misconduct citation issued by defendant Mahalic on June 29, 2008 was "false" and violated his substantive due process rights. (docket # 104 ¶ IV(4), ID # 650). The hearing officer found plaintiff guilty of the major misconduct. This purported substantive due process claim against RUO Mahalic is barred for the reasons specified in section 2 of this report and recommendation.

Unusual Punishments. *See Albright*, 510 U.S. at 273; *Walker v. Norris*, 917 F.2d 1449, 1455 (6th Cir. 1990). Plaintiff has no greater substantive due process rights than the protections provided by the Eighth Amendment.

### 5. Procedural Due Process

Plaintiff's claim that RUO Rutgers confiscated two of his ink pens on March 16, 2008, is not a claim of constitutional dimension. It is well established that a state prisoner asserting a procedural due-process claim arising from a random and unauthorized act of a state officer must first plead and prove the absence of an adequate state remedy. *See Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986); *Stanley v. Vining*, 602 F.3d 767, 769 (6th Cir. 2010); *Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995). If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984).[10] The Sixth Circuit recognizes that Michigan's available post-deprivation remedies are more than adequate to compensate plaintiff for any loss of personal property suffered as a result of defendant Rutgers alleged actions. *See Copeland v. Machulis*, 57 F.3d at 479.

---

[10]Numerous state post-deprivation remedies were available to plaintiff. A prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. *See* MICH. COMP. LAWS § 600.6419(1). Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MICH. COMP. LAWS § 600.6419(1)(a).

6.      **First Amendment**

A.      Access to Courts

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005). In order to establish a viable claim for interference with his access to the courts, a plaintiff must show "actual injury" in a specific case. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996). The actual injury requirement is not satisfied by just any type of frustrated legal claim. The actual injury must be connected to direct pursuit of a non-frivolous direct appeal from a criminal conviction, a habeas corpus petition or a civil rights action under 42 U.S.C. § 1983 to vindicate "basic constitutional rights." *Lewis*, 518 U.S. at 354; *see Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) ("'Depriving someone of a frivolous claim . . . deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions.'") (quoting *Lewis*, 518 U.S. at 353).

Plaintiff has not presented evidence that he suffered any actual injury within the meaning of *Lewis*. The temporary deprivation of a pen or pens, loss of a purported affidavit and grievance forms, restrictions on time in a law library, and restriction on access to legal writers that plaintiff complains of have not resulted in actual injury in any non-frivolous civil action. *Lewis*, 518 U.S. at 354. His argument that his willingness to use ICF's typing room was "chilled," and his ability to prepare affidavits in this action frustrated because Christopher King saw an affidavit on June 6, 2008 (Plf. Brief at 8), cannot withstand scrutiny. He provided no evidence establishing the content of the affidavit. The docket sheet and evidence filed in this matter make pellucid that plaintiff retained access to constitutionally adequate litigation tools. *Lewis*, 518 U.S. at 355.

Plaintiff's amended complaint offers a bare conclusory statement that limited access to law books at ICF caused him prejudice in his habeas corpus petition and in an unspecified civil rights action in which "he failed to get an injunction in time to protect his religious diet in 2009." (Am. Compl. ¶ IV(7)). This does not suffice at the summary judgment stage. Further, the court takes judicial notice of its own records and the records of the United States District Court for the Eastern District of Michigan demonstrating that plaintiff has not suffered actual injury. Plaintiff has suffered no prejudice with regard to his habeas corpus petition. It remains pending in the Eastern District. *See Annabel v. Wolfenbarger*, No. 4:09-cv-10762 (E.D. Mich.). On March 2, 2009, he filed a civil action in this court regarding his prison diet. The case is assigned to United States District Judge Janet T. Neff. On June 30, 2009, Judge Neff denied plaintiff's motion for a temporary restraining order and preliminary injunction to compel MDOC officials to provide him with "a religious diet of grape juice and unleavened bread." The case remains pending before Judge Neff, and the docket sheet reveals that plaintiff recently filed a second motion for leave to amend his complaint, a third motion for a preliminary injunction.

I find that all defendants in this lawsuit are entitled to judgment in their favor as a matter of law on plaintiff's First Amendment claims of interference with his right of access to courts.

B.    Incoming Mail

Prisoners have a limited First Amendment right to receive incoming mail from the outside world. *See e.g.*, *Boswell v. Mayer*, 169 F.3d 384 (6th Cir. 1999). Plaintiff's complaint alleges the conclusion that in the months of June and July, defendants Donald King and Todd Mahalic discarded "several pieces of incoming mail." Plaintiff has not presented evidence that defendants are responsible for his missing mail. These claims fail for want of supporting evidence.

C.    Retaliation

Plaintiff alleges "retaliation" in violation of his First Amendment rights as a component of virtually every claim against every defendant. On summary judgment, a plaintiff asserting a First Amendment retaliation[11] claim must present evidentiary proof on which a reasonable trier of fact could find (1) that the plaintiff had engaged in conduct protected by the First Amendment; (2) that an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from engaging in that conduct; and (3) that the adverse action taken against the plaintiff was motivated, at least in part, by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*); *see also Lustig v. Mondeau*, 211 F. App'x 364, 372 (6th Cir. 2006). The plaintiff has the burden of proof on all three elements. *See, e.g.*, *Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003).

"The first element [plaintiff] must establish for his retaliation claim[s] [is] that he was engaged in conduct protected by the First Amendment." *Hill v. Lippin*, 630 F.3d 468, 472 (6th Cir. 2010). The Sixth Circuit recognizes that a prisoner's filing of a grievance can constitute protected conduct. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). Frivolous grievances are not protected conduct. *See Hill v. Lippin*, 630 F.3d at 472; *Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (calling a hearing officer a "foul and corrupted bitch" was not protected conduct); *Herron v. Harrison*, 203 F.3d at 415. I will assume for analytical purposes that plaintiff engaged in protected conduct.

The second element of a retaliation claim is an adverse action against plaintiff that would deter a person of ordinary firmness from engaging in the protected conduct. It is well

---

[11]"Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

established that "a prisoner is expected to endure more than the average citizen and enjoys no protected right to remain incarcerated in a given correctional facility." *Hix v. Tennessee Dep't of Corrections*, 196 F. App'x 350, 358 (6th Cir. 2006) (citing *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005)). I will assume that the actions forming the basis of all plaintiff's retaliation claims would deter a person of ordinary firmness from the exercise of his First Amendment rights.

Finally, under the causation element of a prisoner's *prima facie* case for retaliation, the subjective motivation of the decisionmaker is at issue. "The third element of a First Amendment retaliation claim requires the plaintiff to prove a causal connection between the protected conduct and the adverse action. When assessing motive in the context of a summary judgment motion, bare allegations of malice do not suffice to establish a constitutional claim. This court has held that circumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399-400 (6th Cir. 2010) (internal quotations and citations omitted). Plaintiff must demonstrate that his protected speech was a substantial or motivating factor in the adverse action taken by defendant. Specifically, plaintiff must point to specific, nonconclusory evidence reasonably linking his speech to the adverse action. *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003). The Sixth Circuit has interpreted this inquiry to mean that a motivating factor is "essentially but-for cause-without which the action being challenged simply would not have been taken" *Vereecke*, 609 F.3d at 400 (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007), and *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)). "Substantial case law from this circuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone." *Vereecke*, 609 F.3d at 400; *see Tuttle v.*

*Metropolitan Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity standing alone, is insufficient to establish a causal connection for a retaliation claim.").

Plaintiff has not presented evidence sufficient to support a causal connection between his protected conduct and the allegedly retaliatory acts. An affidavit or verified complaint "contain[ing] only conclusory allegations and naked conclusion of law" does not create a genuine issue of fact for trial. *Sigmon v. Appalachian Coal Prop., Inc.*, No. 08-6258, 2010 WL 3736276, at * 5 (6th Cir. Sept. 17, 2010); s*ee Doe v. Magoffin County Fiscal Ct.*, 174 F. App'x at 966; 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY K. KANE, FEDERAL PRACTICE & PROCEDURE § 2738 at 346-56 (3d ed. 1998).

"Even if the plaintiff establishes all three elements, the defendant may avoid liability by showing 'that the same action would have been taken in the absence of protected activity.'" *Whiteside v. Parrish*, 387 F. App'x 608, 612 (6th Cir. 2010)(quoting *Thaddeus-X*, 175 F.3d at 399). Plaintiff's behavior necessitating the use of restraints is well documented. Hearing officers found plaintiff guilty of the major misconducts, often on the basis of plaintiff's admission that he violated prison rules but should be excused. A prisoner who claims that the bringing of a misconduct charge, in and of itself, is retaliatory faces an insurmountable obstacle where, as here, the charge is upheld by a neutral attorney-hearing officer. "A finding of guilt based upon some evidence of a violation of prison rules 'essentially checkmates [a] retaliation claim.'" *Clemons v. Cook*, 52 F. App'x 762, 763 (6th Cir. 2002) (quoting *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994)); *accord Wade-Bey v. Fluery*, No. 2:07-cv-117, 2010 WL 1028036, at * 2 (W.D. Mich. Mar. 18, 2010) ("The fact that Plaintiff was found to have committed the actions alleged in the misconduct tickets, and was sanctioned accordingly, is conclusive evidence that Defendants filed the misconduct tickets against

Plaintiff because he engaged in punishable activity, not as retaliation for any protected conduct."). The decisions finding plaintiff guilty of the major misconduct charges establish that he violated prison rules and that the same actions would have been taken in the absence of plaintiff's grievances. Defendants are entitled to judgment in their favor as a matter of law on all plaintiff's retaliation claims.

## Recommended Disposition

For the reasons set forth herein, I recommend that plaintiff's claims for declaratory relief be dismissed as moot. I further recommend that defendants' motions for summary judgment (docket #s 40, 85, 94) be granted, and that a final judgment be entered in defendants' favor on all plaintiff's claims.

Dated:   March 30, 2011                      /s/  Joseph G. Scoville_____
                                                                United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).